IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| AMIE M. McCOY, | ) | CASE NO.  3:15-cv-02308 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Amie M. McCoy ("Plaintiff" or "McCoy") seeks judicial review of the final

decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner")

denying her applications for social security disability benefits.  Doc. 1.  This Court has

jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned Magistrate

Judge pursuant to the consent of the parties. Doc. 13.

The Court **REVERSES and REMANDS** the Commissioner's decision.  As explained

more fully below, reversal and remand is warranted because the vocational expert's ("VE")

testimony is unclear and there is uncertainty as to whether the VE identified jobs in response to a

VE hypothetical that accurately portrayed the RFC limitations regarding pace restrictions or

whether the VE was responding to a modified or alternate hypothetical.  Accordingly the Court is

unable to determine whether the ALJ's Step Five determination is supported by substantial

evidence.

## I.  Procedural History

On October 16, 2009, McCoy applied for Childhood Disability Benefits, Disability

Insurance Benefits, and Supplemental Security Income.  Tr. 123-125, 126-127, 270-279, 364-

368, 369-377, 394-395, 397-398.  She alleged a disability onset date of October 1, 2006 (Tr. 19), and alleged disability due to mental retardation, mental illness, problems functioning, suicidal thoughts, and increased need for sleep.  Tr. 154, 157, 160, 163, 169, 173, 176, 370.  McCoy's applications were denied initially (Tr. 154-162) and upon reconsideration by the state agency (Tr. 169-189).  Thereafter, she requested an administrative hearing.  Tr. 190.

On January 19, 2012, Administrative Law Judge Craig R. Petersen ("ALJ Petersen") conducted an administrative hearing.  Tr. 86-122.  On February 9, 2012, ALJ Petersen issued a decision denying benefits.  Tr. 129-149.  On April 6, 2012, McCoy requested review by the Appeals Council of the February 9, 2012, decision.  Tr. 238-240.   The Appeals Council granted McCoy's request for review and, on February 27, 2013, the Appeals Council concluded that ALJ Petersen had not adequately considered third party statements from McCoy's mother.  Tr. 151-152.  In addition, the Appeals Council noted that the vocational expert had admitted at the hearing that her testimony was based on input from another vocational expert who was not present at the hearing.  Tr. 152.  The Appeals Council remanded McCoy's case to an Administrative Law Judge for further proceedings, to obtain additional evidence, further consider McCoy's residual functional capacity, further evaluate the third party statements, and obtain evidence from a vocational expert to clarify the effect of the assessed limitations on the occupational base. Tr. 150-153.

On remand, on January 9, 2014, Administrative Law Judge Gabrielle Vitellio ("ALJ") conducted an administrative hearing. Tr. 44-84.   In her March 24, 2014, decision (Tr. 16-43), the ALJ determined that McCoy had not been under a disability from October 1, 2006, through the date of the decision and had not been under a disability at any time prior to the date she attained age 22.  Tr. 20, 35.  McCoy requested review of the ALJ's decision by the Appeals

Council.  Tr. 14-15.  On September 13, 2015, the Appeals Council denied McCoy's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-6.

## II. Evidence

**A.     Personal, vocational and educational evidence**

McCoy was born in 1984.  Tr. 270, 364.   At the time of the January 9, 2014, hearing, McCoy was 29 years old (Tr. 47-48) and had been living in a house owned by her friend's dad for about four years[1] (Tr. 47, 51-52).

McCoy had three children, a 12 year-old daughter and 8 year-old twins.  Tr. 48-49. McCoy's parents took guardianship of her 12-year old before the child was born and took guardianship of her twins when they were about 6 months old.  Tr. 49.  McCoy was living with her parents and children when the twins were born.  Tr. 49.   McCoy's parents reside in Cincinnati.  Tr. 50.  She sees her children every couple of months when her friend is able to take her to Cincinnati.  Tr. 50, 63-64.  Because of her mom's work schedule and dad's health condition, they do not bring her children to see her.  Tr. 63.  McCoy expressed some interest in trying to get her children back but is not sure she could handle it.  Tr. 50.

In 1989, the Cincinnati Center for Developmental Disorders evaluated McCoy when she was four years old.  Tr. 603-607.   On standardized psychological testing, McCoy's age equivalent was 2 years and 6 months at a chronological age of 4.  Tr. 603.  Among other testing results, McCoy's intellectual functioning was estimated to be between the borderline and mild levels of delay. Tr. 603.  McCoy's prognosis at that time was that she would continue to grow and develop but she would probably always be somewhat slower than most children her age.  Tr.

---

[1] McCoy resided in the upstairs portion of the house and her friend resided downstairs.  Tr. 52.  According to McCoy, the house was a big old house that afforded access to the upstairs and downstairs without having to go outside.  Tr. 47, 52.  Her monthly rent was $400.00, which was paid through the metropolitan housing authority.  Tr. 52.

603.  Her outlook for developing language and learning skills appeared to be good with proper educational and behavioral intervention.  Tr. 605.  While in school, McCoy received special education services.  Tr. 321-345.  In 2001, when McCoy was 16, the school psychologist, as part of a three-year re-evaluation for students receiving special education services, recounted past intelligence testing scores and noted that it was "probable [McCoy's] general intelligence significantly interferes with academic progress."  Tr. 326.  McCoy finished twelfth grade but did not graduate from high school.  Tr. 60.  She quit school right before she graduated.  Tr. 61.  She had turned 18 years and just gave up and did not listen to her parents.  Tr. 61.

McCoy last worked in 2012 for a few months at a factory making plastic totes.  Tr. 54-55.  Her job consisted of trimming the plastic off around the edges of the totes.  Tr. 55.  She was let go from her position because she was not performing the job as fast as her employer expected her to.  Tr. 55-56.  The machine kept clogging or breaking down because she was not moving fast enough.  Tr. 56.  Her past work also includes work at a business called Twist and Shout doing dishes and making ice cream cones or sundaes.  Tr. 54.  The job McCoy held longest was as a cashier at a United Dairy Farmers.  Tr. 57-58.  She worked there in 2000 or 2001 for almost a year.  Tr. 57.  Her mother was the manager of the store.  Tr. 57.  Her mother ended up quitting.  Tr. 57.  McCoy was only 16 or 17 years old at the time and her mom made her quit due to the problems her mother was having with the store.  Tr. 57.  McCoy also worked as a cashier at Wal-Mart.  Tr. 58.  When working as a cashier, at times, McCoy had to use a calculator for math.  Tr. 58.  McCoy has tried to look for work since 2012 but has not had any luck finding a job.  Tr. 57-58.

## B.    Medical evidence[2]

### 1.    Medical records

On September 15, 2006, McCoy underwent an adult diagnostic assessment at TCN

Behavioral Health Services ("TCN").  Tr. 470-478, 830-833.   McCoy was seeking treatment for

depression and bipolar symptoms.  Tr. 470.  She reported that she was having a lot of problems

with severe depression with periods of being really hyper and feeling anxious.  Tr. 470.  She also

reported problems with concentration and problems sitting still.  Tr. 477.  McCoy reported that

she had used meth in the past but was no longer using.  Tr. 470.   McCoy's diagnoses included

bipolar I disorder, most recent episode depressed, severe without psychotic features and

amphetamine dependence, early full remission.  Tr. 478.  A GAF score of 42 was assigned.[3]  Tr.

478.   Based on recommendations form the diagnostic assessment, McCoy was seen again at

TCN for a psychiatric assessment on October 3, 2006.  Tr. 465-469.   McCoy was diagnosed

with mood disorder, NOS, and meth dependence in early remission and she was assigned a GAF

score of 55.[4]  Tr. 469.  McCoy was started on Wellbutrin, with recommendations to follow up in

one month and continue with AOD (alcohol and other drug) treatment and individual therapy.

---

[2] McCoy's arguments pertain to the ALJ's consideration of her mental impairments. Accordingly, evidence of
physical impairments is not discussed.

[3] As set forth in the DSM-IV, GAF (Global Assessment of Functioning) considers psychological, social and
occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric
Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.
Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 41 and 50
indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious
impairment in social, occupational, or school functioning (e.g., few friends, unable to keep a job)." *Id.* With the
publication of the DSM-5 in 2013, the GAF was not included in the DSM-5.  *See* American Psychiatric Association:
*Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric
Association, 2013  ("DSM-5"), at 16

[4] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or
school functioning.  *See* DSM-IV-TR, at 34.

Tr. 469, 490, 491, 492.  McCoy continued treatment at TCN for mood swings, depression, and meth dependence, in remission.  Tr.  463, 465-469, 481-482, 483-484, 485, 489.

An October 30, 2006, TCN progress note reflects that McCoy did not attend any AOD counseling sessions.  Tr. 480.  On November 15, 2006, McCoy was seen at TCN following an attempted overdose on Wellbutrin.  Tr. 479, 486-487, 493-494, 540-543.  Her boyfriend of 2 ½ years was involved in another relationship and broke up with her.  Tr. 479.  McCoy was mildly depressed with a full affect.  Tr. 479.  She was calm, relaxed and cooperative.  Tr. 479.  McCoy was admitted overnight at TCN's Creekside Services for observation.  Tr. 479, 493-502, 809-810, 844-850.  She was discharged on November 16, 2006.  Tr. 493.

McCoy was discharged from TCN in May 2007 because she "did not return." Tr. 463.  The discharge summary reflects that overall McCoy showed some improvement during her treatment.  Tr. 464.

In March 2009, McCoy sought treatment with Scioto Paint Valley Mental Health Center ("Scioto").  Tr. 569-574.  A diagnostic assessment was completed on March 31, 2009.  Tr. 569-574.  McCoy was living with her parents who had custody of her children.  Tr. 572.  McCoy reported that she had been experiencing anxiety and was irritable with her children a lot.  Tr. 572.  She wanted medication to help her with her anxiety.  Tr. 572.  McCoy did not think that counseling would help.  Tr. 572-573.  McCoy was diagnosed with mood disorder, NOS, and assigned a GAF score of 58.  Tr. 574.  Since McCoy was not interested in counseling, she was referred to her family doctor for medication.  Tr. 573.  On September 12, 2009, Scioto terminated its treatment relationship with McCoy because McCoy did not return for counseling with Scioto,.  Tr. 567-568.

On June 28, 2011, McCoy saw James A. Gottfried, M.D., complaining of severe anxiety and panic attacks.  Tr. 626-628.  McCoy indicated that she had been having the problems for a year and she described her symptoms as moderate in severity.  Tr. 626.  She also reported having insomnia.  Tr. 626.  She denied suicidal ideation.  Tr. 626.  McCoy reported a history of major depression which she was treating with Prozac.  Tr. 626.  On examination, McCoy's mood and affect were normal and appropriate.  Tr. 627.  She was talkative and answered questions appropriately.  Tr. 627.  Her thought processes were normal.  Tr. 627.  She had no hallucinations, delusions or psychotic thoughts.  Tr. 627.  Dr. Gottfried assessed mild depression and anxiety disorder, generalized, and prescribed buspirone.  Tr. 627.

### 2.    Opinion evidence

#### a.    Consultative examining psychologists

_Dale Seifert, M.S. Ed._

On January 28, 2005, Dale Seifert, M.S. Ed., a licensed psychologist, interviewed and tested McCoy.  Tr. 456-461.  At the time of the interview, McCoy was 20 years old and unemployed.  Tr. 460.  McCoy was applying for disability benefits based on alleged mental retardation.  Tr. 460.  McCoy dropped out of high school and she did not obtain her GED.  Tr. 460.  Mr. Seifert indicated that McCoy's WAIS-III test results demonstrated that McCoy's cognitive skills fell in the lower limits of borderline intellectual functioning range.  Tr. 460.  Mr. Seifert indicated that McCoy's Wechsler Memory Scale-III test results showed that she had significant deficits in both immediate and delayed auditory memory and immediate and delayed visual memory.  Tr. 460.  McCoy's Woodcock-Johnson test results showed that McCoy's reading skills were on a beginning fifth grade level.  Tr. 460.   Mr. Seifert diagnosed McCoy

with borderline intellectual functioning and he assessed a GAF score of 63.[5]  Tr. 461.  As far as

McCoy's functional abilities, Mr. Seifert opined that:

1. Ms. McCoy has mild limitations in her ability to relate to others including
   coworkers and supervisors.  She related relatively well during the session and
   reported that when she has been employed she has gotten along well with
   others in the work setting.

2. Ms. McCoy has mild limitations in her ability to understand and follow
   instructions.   Testing indicates her cognitive skills fall in the borderline
   intellectual functioning range.

3. Ms. McCoy has mild limitations in her ability to maintain attention to perform
   simple, repetitive tasks.  She processed at an adequate pace during the session,
   although testing indicates she has significant deficits in both auditory and
   visual memory.

4. Ms. McCoy has mild limitations in her ability to withstand the stress and
   pressures associated with day-to-day work activity.  She reported that she does
   not feel depressed or anxious.

Tr. 461.

### Thomas Evans, Ph.D.

On April 1, 2010, Thomas M. Evans, Ph.D., conducted a psychological evaluation.  Tr.

577-582.   At the time of the evaluation, McCoy was 25 years old.  Tr. 577.  McCoy reported

that she had been enrolled in special education classes since the 1st grade.  Tr. 578.  She

completed school through the 11th grade and did not obtain her GED or complete any college

courses.  Tr. 579.  McCoy had been unemployed since May of 2009 and last worked as a packer

for about two months.  Tr. 579.  McCoy discussed her past suicide at age 22 which resulted in

hospitalization.  Tr. 579.  She was not seeing a psychiatrist at the time of the evaluation and

stated that she had never been involved in counseling.  Tr. 578.   Dr. Evans diagnosed McCoy

---

[5] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or
some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the
household), but generally functioning pretty well, has some meaningful interpersonal relationships."  *Id.*

with depressive disorder, NOS, and assessed a GAF score of 60.[6]  Tr. 580-581.  Dr. Evans noted

that McCoy reported manic episodes that were triggered by anger and she stated that people

made her angry.  Tr. 579.  Dr. Evans did not diagnose bipolar disorder because he concluded that

the only symptom she reported in that regard was anger, which was usually triggered during

interaction with others.  Tr. 580.  Dr. Evans found that McCoy denied psychotic symptoms and

did not appear psychotic during the evaluation.  Tr. 580.  McCoy did not have delusional

ideation.  Tr. 580.  Dr. Evans indicated that McCoy was cooperative and friendly throughout the

entire interview, with rapport being easily established and maintained.  Tr. 580.

Dr. Evans found that McCoy's ability to concentrate and pay attention to simple

questions was not impaired based on her performance on the mental status examination.  Tr. 580.

Dr. Evans found that McCoy's ability to understand and follow simple, repetitive directions was

not impaired but would likely be mildly impaired for more complex directions.  Tr. 580.  Noting

that no testing was done, Dr. Evans opined that McCoy appeared to be of sub-average

intelligence.  Tr. 580.  Dr. Evans further opined that McCoy's ability to withstand stress and

pressure was mildly impaired considering her current depression.  Tr. 580.  He opined that

McCoy's ability to relate to others and deal with the general public was moderately impaired in

light of her anger and poor tolerance for frustration.  Tr. 580.  Dr. Evans also found that

McCoy's insight into her then current situation and problems appeared to be adequate and her

social judgment appeared to be fair.  Tr. 580-581.  Dr. Evans indicated that McCoy was able to

fully participate in routine daily household activities.  Tr. 581.

---

[6] A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

*Wayne Morse, Ph.D.*

On June 10, 2013, Wayne Morse, Ph.D., conducted a psychological evaluation. Tr. 748-758. Dr. Morse completed a report dated June 10, 2013. Tr. 748-758. As part of the evaluation, Dr. Morse interviewed McCoy, reviewed past evaluations and assessments, performed a mental status examination, and performed an intellectual assessment, consisting of the Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV). Tr. 748. At the time of the evaluation, McCoy was 28 years old. Tr. 749.

McCoy relayed that she had received disability benefits when she was a baby. Tr. 749. Her benefits had stopped but she did not know why. Tr. 749. She had been applying for benefits since 2007 and appealing the denials. Tr. 749. McCoy indicated that she was very unhealthy. Tr. 749. She reported having migraines, back pain and toothaches. Tr. 749. With no insurance, she was unable to get treatment. Tr. 749. McCoy's three children had always lived with her parents and they had custody of them. Tr. 749. She indicated that she would like to have her kids back but was not sure that she would be able to have the patience to deal with them. Tr. 749.

McCoy reported that she had been taking Prozac, Zoloft and Imitrex but had stopped because she had no insurance. Tr. 750. According to McCoy, she had only briefly tried mental health treatment. Tr. 751. She indicated that the medication was helpful but actual therapy was not. Tr. 751.

Dr. Morse found that McCoy provided consistent information but noted that there was evidence of symptom exaggeration, especially with respect to the intellectual assessment. Tr. 753. Dr. Morse diagnosed bipolar disorder, most recent episode depressed, moderate severity;

panic disorder without agoraphobia; adjustment disorder with anxiety; learning disorder, NOS; and borderline intellectual functioning.  Tr. 755.  He assessed a GAF score of 60.  Tr. 755. Dr. Morse noted that McCoy's self-reported symptoms of bipolar I disorder, anxiety, and learning problems was inconsistent with behavioral observations, collateral information, the mental status examination, and intellectual assessment.  Tr. 755.  He attributed the inconsistencies to McCoy's symptom exaggeration.  Tr. 755.  Dr. Morse concluded that there was no evidence to suggest that McCoy's mental health issues significantly interfere with her functioning.  Tr. 755.  McCoy's WAIS-IV full IQ score was a 69.  Tr. 754.  Dr. Morse opined that, due to McCoy's symptom exaggeration, her score was an underrepresentation of her true cognitive ability.  Tr. 754.

In assessing McCoy's functional abilities, Dr. Morse opined:

1.  The claimant reported great difficulty with her memory, performed very well on the memory recall task of the mental status examination, and was a fairly good historian.  She had no difficulty understanding and responding to the evaluator's questions.  There was evidence of learning difficulties based on the claimant's self-report, but she exaggerated her symptomatology on the intellectual assessment.  The claimant's estimated intelligence level suggested that she is able to carry out tasks requiring Low Average Intelligence.

   There was no evidence to suggest that the claimant would have any difficulty remembering work-like procedures or have difficulty understanding and remembering very short and simple instructions, as well as detailed instructions.

2.  The claimant reported great difficulty with her attention, performed poorly on the attention tasks of the mental status examination and Working Memory Index (WMI) of the WAIS-IV.  However, she exaggerated her symptomatology and had no difficulty expressing her thoughts in an organized manner.

   There was no evidence to suggest that the claimant would have any difficulty carrying out very short and simple instructions, as well as detailed instructions.  She would have minor difficulty sustaining an ordinary routine, performing at a consistent pace, making simple work-related decisions, and

completing a normal workday without occasional interruptions from her mental health symptoms.

3. The claimant related adequately to the evaluator but reported some difficulty in her interpersonal relationships.  There was evidence of legal difficulties but no problems with authority.

There was evidence to suggest that the claimant would have difficulty interacting with the general public due to her anxiety.  She reported an inability to work fast enough, which has interfered somewhat with her ability to work in coordination with others, ask simple question, request assistance, or respond appropriately to criticism from supervisors.  However, she exaggerated her symptomatology.  Therefore, her capacity to respond to others in the work setting is only slightly impaired.  She is able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness.

4. Since the claimant exaggerated her symptomatology, there was no evidence to suggest that she is unable to respond appropriately to changes in the work setting, set realistic goals, make plans independently of others, or engage in activities independent of supervision or direction.  There was no evidence to suggest that she is unable to engage in adaptive activities such as household chores or caring for her personal hygiene.  She reported difficulty managing her finances.

There was evidence to suggest that the claimant's mental health symptoms interfere somewhat with her functioning, and that she would have minor difficulty managing normal, everyday work pressures.  She experiences some difficulty with social interaction and concentration.  However, she exaggerated her symptomatology in these areas.  Her work history suggested that when under stress, she is likely to avoid work altogether or have difficulty completing tasks.

Tr. 755-757.

Also, on June 20, 2013, Dr. Morse completed a Medical Source Statement of Ability to do Work-Related Activities (Mental).  Tr. 759-761.  In that statement, Dr. Morse opined that McCoy's ability to understand, remember, and carry out instructions was not affected by her impairment.  Tr. 759.  Dr. Morse opined that McCoy had mild impairments in her ability to interact appropriately with supervision, co-workers, and the public, as well as respond to changes in the routine work setting.  Tr. 760.   In explaining his opinion, Dr. Morse stated that "claimant

self-reported difficulty with social interaction and difficulty finishing tasks in a timely manner

due to her anxiety.  However, she exaggerated her symptomatology." Tr. 760.  Dr. Morse also

indicated that "claimant reported great difficulty with her concentration, performed poorly on the

attention tasks of the mental status examination, and performed poorly on the attention tasks of

the WAIS-IV" but added that "claimant exhibited clear signs of symptom exaggeration,

providing an underrepresentation of her true cognitive ability and capacity for attention.  Her

capacity for attention is only slightly impaired."  Tr. 760.

### b.  State agency reviewing psychologists

_Melanie Bergsten, Ph.D._

On April 19, 2010, state agency reviewing psychologist Melanie Bergsten, Ph.D.,

completed a Psychiatric Review Technique. Tr. 583-596.  Also, on April 19, 2010, Dr. Bergsten

completed a Mental RFC Assessment.  Tr. 597-600.   In the Psychiatric Review Technique, Dr.

Bergsten opined that McCoy did not have a listing level impairment but concluded the McCoy

had the following conditions: depressive disorder, NOS; borderline intellectual functioning (full

scale IQ score of 72); and a history of meth dependence.  Tr. 586-587, 591.  Dr. Bergsten rated

McCoy's functional limitations, concluding that McCoy had mild limitations in activities of

daily living and moderate limitations in maintaining social functioning and maintaining

concentration, persistence or pace.  Tr. 593.  There were no episodes of decompensation.  Tr.

593.  In the Mental RFC Assessment, Dr. Bergsten rated McCoy's functional abilities in 20

categories.[7]  Tr. 597-598.   Dr. Bergsten rated McCoy moderately limited in the following 7

categories: (1) ability to understand and remember detailed instructions; (2) ability to carry out

detailed instructions; (3) ability to complete a normal workday and workweek without

---

[7] The available rating choices were: (1) not significantly limited; (2) moderately limited; (3) markedly limited; (4)
no evidence of limitation in this category; and (5) not ratable on available evidence.  Tr. 597-598.

interruptions from psychologically based symptoms and to perform at a constant pace without an unreasonable number and length of rest periods; (4) ability to interact appropriately with the general public; (5) ability to accept instructions and respond appropriately to criticism from supervisors; (6) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and (7) ability to respond appropriately to changes in the work setting.  Tr. 597-598.  In the remaining 13 categories, Dr. Bergsten rated McCoy's abilities as not significantly limited.  Tr. 597-598.

In assessing McCoy's mental RFC, Dr. Bergsten found McCoy's statements partially credible, noting that McCoy had alleged mental retardation but the evidence in the file was more consistent with borderline intellectual functioning.  Tr. 599.   In narrative form, Dr. Bergsten opined that McCoy had "the ability to perform simple, repetitive tasks in situations where duties are relatively static and changes can be explained.  She is also capable of relating to a few familiar others on a superficial basis."  Tr. 600.

### Suzanne Castro, Psy.D.

On reconsideration, on July 12, 2010, state agency reviewing psychologist, Suzanne Castro, Psy. D., concluded that there were "no new evidence to indicate changes in severity from the 4/19/2010 assessment."  Tr. 601.

## C.    Testimonial evidence

### 1.    Plaintiff's testimony

McCoy was represented at and testified at the January 9, 2014.  Tr. 47-76.

McCoy stated that she felt she was unable to work because she is unable to perform jobs fast enough, cannot comprehend how to perform jobs correctly, or gets aggravated with jobs.  Tr. 69-70.  She explained that it takes her a minute to be able to truly understand something, stating

14

that she has a hard time comprehending and gets confused. Tr. 70, 75.   As far as her ability to comprehend, McCoy indicated that she has trouble comprehending most everything and explained that if she reads something she cannot tell you what she has just read. Tr. 60.   In the past, when she asked for extra explanation at a job, the response would be "hang on a minute" or they would get aggravated with her.  Tr. 75.  While working past jobs, McCoy has felt overwhelmed.  Tr. 75-76.   She stated that it was hard for her to explain but she gets overwhelmed and confused.  Tr. 76.  She did not know where to begin and end – she would know that she needed to move faster but could not.  Tr. 76.

Other than her friend who lives downstairs from her, McCoy's support includes her friend's father and friend's girlfriend.  Tr. 50.  She met her friend through another friend when she was living down in Southern Ohio.  Tr. 51.  She ended up moving north to get away from the drugs and partying that was going on in her life.  Tr. 51.   Her drug of choice was meth.  Tr. 51.  Since moving away from that environment she has been able to stay off of the drug.  Tr. 51.  In 2007 or 2008, when she was just getting off of meth, she was depressed and her boyfriend was breaking up with her.  Tr. 61.  She attempted to hurt herself by taking a bottle of Wellbutrin CR, which had been prescribed to her at the time.  Tr. 61-62.  She ended up at the Christopher House in Xenia for three or four days.  Tr. 61.  Since that incident, McCoy has not tried to hurt herself.  Tr. 62.  She has not been in therapy but has wanted to see a counselor or psychiatrist so she can get medication for depression and anxiety.  Tr. 62.  However, since she does not have insurance or money, she cannot get in to see anyone.  Tr. 62.  She had previously been prescribed Prozac and, when she was taking it, she felt more relaxed about things.  Tr. 62-63.

With respect to activities of daily living, McCoy indicated that her friend who lives downstairs from her friend and his girlfriend Tiffany help out with things such as cooking,

grocery shopping and keeping the house clean.  Tr. 65.  McCoy does not trust herself using a stove because, when she used the stove in 2010, she caught the kitchen cabinet on fire.  Tr. 65. She had a skillet on the stove that she forgot about when she went outside.  Tr. 65.  When she returned from outside, the kitchen cabinet above the stove was on fire.  Tr. 65.  She yelled downstairs for her friend and he was able to put the fire out.  Tr. 65-66.  McCoy looks online for recipes and Tiffany helps her prepare the recipes.  Tr. 67.  Also, Tiffany normally helps her with cleaning the house.  Tr. 66.  McCoy can do some cleaning but gets overwhelmed with the task feeling like there is too much to do and too much dust.  Tr. 66-67.  McCoy reported needing help with shopping because, if she goes shopping, she ends up buying things, e.g., junk food, she really does not need.  Tr. 66.  Also, she stated that she is afraid to drive to the store because it is far away.  Tr. 66.  McCoy is able to drive but does not like to drive very far because dealing with traffic makes her nervous.  Tr. 53-54.  McCoy reported having to take her driver's test four times before passing.  Tr. 59.  She later lost her license and had to retake the test in 2011 and passed the test the first time.  Tr. 59-60.

McCoy spends time doing crossword puzzles, looking online for recipes, using Facebook, and playing a connect-the-dots game.  Tr. 67-68.  She recently started a new craft using yarn.  Tr. 68.  McCoy will watch the news but she usually does not watch movies because she gets bored or sleepy.  Tr. 68.  McCoy's friends who live downstairs from her do not go out often themselves and McCoy prefers to stay home because she finds staying home to be more comfortable and she does not have to deal with people getting on her nerves.  Tr. 68-69.  Without her depression and anxiety medication, McCoy feels that people get under her skin a lot easier.  Tr. 69.  As an example, she indicated that standing in line for a long time while someone in front of her is using

a lot of coupons would get on her nerves.  Tr. 69.  She really only leaves her home to go to the

gas station or store and to visit her parents every couple months.  Tr. 68.

McCoy indicated that she had been experiencing migraine headaches every other or every

day for about seven or eight months.  Tr. 72-74.  She had been seeing a neurologist and was

taking Imitrex which made her sleepy but otherwise had helped.  Tr. 73.  She lost her insurance

and did not have the funds to continue with the treatment or medication.  Tr. 73.  When she gets

a migraine, she tries to manage it and if she cannot she has sought treatment at the emergency

room.  Tr. 73-74.

### 2.      Vocational Expert

 Vocational Expert James Fuller ("VE") testified at the hearing.  Tr.  76-83, 451.  Before

questioning the VE, the ALJ stated that whether or not McCoy's past factory work would be

considered past relevant work was not pertinent because the ALJ was not going to allow for jobs

requiring high production quotas.  Tr. 77.   The ALJ then asked the VE to consider the following

hypothetical:

> I have a younger individual with a limited education, such as the Claimant.  I am
> not finding any exertional limitations.  I'm going to say SVP: 1 to SVP: 2. I'm
> going to say no high production quotas on the job, no public interaction, and
> occasional interaction with the public, and super work -- and supervisors.  That
> should keep the stress level as low as possible with regard to feeling
> overwhelmed.

Tr. 77.[8]   Based on that hypothetical, the ALJ asked the VE whether he could identify three

occupations with local and national numbers.  Tr. 77.  The VE indicated that some examples

included: (1) packager, with 346,000 jobs available in the nation and 16,000 in northern Ohio;

(2) dishwasher, with 1 million in the nation and 20,000 in northern Ohio; and (3) cleaner, with

---

[8] SVP refers to the DOT's listing of a specific vocational preparation (SVP) time for each described occupation.
Social Security Ruling No. 00-4p, 2000 SSR LEXIS 8, *7-8 (Social Sec. Admin.  December 4, 2000).   Using the
skill level definitions  in 20 CFR §§ 404.1568 and 416.968, unskilled work corresponds to an SVP of 1-2.  *Id.*

1.5 million in the nation and 25,000 in northern Ohio.  Tr. 77.   The ALJ asked the VE to confirm that the packager job would not require high production quotas on an assembly line.  Tr. 77.  In response, the VE clarified that the packager job was a hand packager position that "would require an expectation of production throughout the day, but it would not be where the work would be determined by an external source."  Tr. 78.  The VE defined SVP: 1 to SVP: 2 work as unskilled work that can be learned in 30 days or less.  Tr. 78.  The VE explained that standard breaks over the course of a 9-hour workday are a 15 minute break in the morning and afternoon and a 30 minute lunch period.  Tr. 78.  The tolerance for absences was one day per month, with less tolerance for absences during a probationary period.  Tr. 78.   The VE also indicated that the standard tolerance for being off-task was 10% or no more than 6 minutes per hour in unskilled work.  Tr. 78.

McCoy's attorney asked the VE about the "no high production quotas" portion of the hypothetical question and the VE indicated that he understood the limitation of "no high production quotas" to mean that "pace is not dictated by an external source."  Tr. 80.  The VE explained that different employers would have different daily production requirements.  Tr. 80.  As an example, the VE explained that a dishwasher would be expected to wash dishes, not necessarily immediately upon the dishes coming in but there would an expectation over the course of the day that the work would be generally consistent and completed at the end of the employee's shift.  Tr. 80.   The VE agreed that you could have an instance where a dishwasher working at a restaurant on a busy night would have to work at a faster pace than a worker working on an assembly line being run at a slow pace.  Tr. 81.   In response to questions from McCoy's counsel, the VE also confirmed that he understood the social restrictions in the ALJ's hypothetical to be "no public contact, occasional coworker and supervisor"  and occasional to

mean up to one-third of the work day.  Tr. 82.   With respect to unskilled work, the VE stated

that supervision for one-third of the work day is generally adequate, even during a training

period.  Tr. 82.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the

existence of a disability.  "Disability" is defined as the "inability to engage in any substantial

gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable
> to do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in
> the national economy[9] . . . .

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

1.    If claimant is doing substantial gainful activity, he is not disabled.

2.    If claimant is not doing substantial gainful activity, his impairment must
      be severe before he can be found to be disabled.

3.    If claimant is not doing substantial gainful activity, is suffering from a
      severe impairment that has lasted or is expected to last for a continuous
      period of at least twelve months, and his impairment meets or equals a
      listed impairment,[10] claimant is presumed disabled without further inquiry.

---

[9] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the
region where such individual lives or in several regions of the country."  42 U.S.C. § 423(d)(2)(A).

[10] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P,
App. 1, and describes impairments for each of the major body systems that the Social Security Administration

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[11] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the RFC and vocational factors

to perform work available in the national economy.  *Id.*

## IV. The ALJ's Decision

In her March 24, 2014, decision, the ALJ made the following findings:[12]

1.      McCoy was born in 1984 and had not attained age 22 as of October 1, 2006, the alleged onset date.  Tr. 21.

2.      McCoy met the insured status requirement through March 31, 2010.  Tr. 21.

3.      McCoy had not engaged in substantial gainful activity since October 1, 2006, the alleged onset date.  Tr. 21-22.

4.      McCoy had the following severe impairments: migraines, borderline intellectual functioning, depression, and anxiety.  Tr. 22.

---

considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

[11] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

[12] The ALJ's findings are summarized.

5.     McCoy did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. Tr. 22-24.

6.     McCoy had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: she is limited to work with no more than a SVP (specific vocational preparation) of one to two which means work that can be learned in no more than thirty days and work which does not require any decision-making; occasional interaction with coworkers and supervisors; and work with no high production quotas. Tr. 24-33.

7.     At all times relevant to the decision, McCoy was unable to perform any past relevant work. Tr. 33.

8.     McCoy was born in 1984 and was 21 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 33.

9.     McCoy has a limited education and is able to communicate in English. Tr. 33.

10.    Transferability of job skills was not an issue because McCoy's past relevant work is unskilled.

11.    Considering McCoy's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that McCoy could perform, including package, dishwasher, and cleaner. Tr. 34-35.

Based on the foregoing, the ALJ determined that McCoy had not been under a disability from October 1, 2006, through the date of the decision, and not under a disability, at any time prior to the date McCoy attained age 22. Tr. 35-36.

## V. Parties' Arguments

McCoy argues that the ALJ did not properly explain the weight given to portions of the opinions of state agency reviewing psychologists Drs. Bergsten and Castro regarding McCoy's ability to adapt to changes and relate to a few familiar others superficially and/or erred by not including restrictions for limitations with respect to adapting to changes and relating to a few

familiar others superficially.  Doc. 15-1, pp. 16-20, Doc. 21, pp. 2-4.  Next, McCoy argues that

the ALJ erred in the manner in which the ALJ weighed and discussed various GAF scores.  Doc.

15-1, pp. 20-22, Doc. 21, pp. 4-5.  Lastly, McCoy contends that the ALJ's RFC finding that

McCoy could not maintain "fast-paced production quotas" was inconsistent with the text of the

ALJ's decision, which referred to "production quotas mandated by an external source" and the

ALJ erred in relying on VE testimony that excluded only those jobs in which the pace was driven

by an "external source."  Doc. 15-1, pp. 23-24, Doc. 21, pp. 5-7.

In response, the Commissioner argues that the ALJ reasonably evaluated the medical

opinion evidence and was not required to adopt Drs. Bergsten's and Castro's opinions verbatim.

Doc. 18, pp. 9-11.   The Commissioner also argues that the ALJ reasonably considered McCoy's

GAF scores.  Doc. 18, pp. 12-14.  Finally, the Commissioner argues that the ALJ reasonably

relied upon the VE's testimony and the VE did not narrow or alter the pace restriction from

prohibiting high-production quotas to prohibiting only fast-paced production quotas determined

by an external source.  Doc. 18, pp. 14-16.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination

that the Commissioner has failed to apply the correct legal standards or has made findings of fact

unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321

F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less

than a preponderance and is such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028,

1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681

(6th Cir. 1989).

The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  Accordingly, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.**     **The ALJ properly evaluated the opinions of the state agency reviewing psychologists**

McCoy argues that the ALJ gave "overall great weight" to the opinions of state agency non-examining psychologists Drs. Bergsten and Castro but failed to include in the RFC or adequately explain the reasons for not including limitations to account for all restrictions noted in the opinions of Drs. Bergsten and Castro.  Doc. 15-1, pp. 16-20, Doc. 21, pp. 2-4.  More particularly, McCoy contends that the ALJ should have adopted the psychologists' specific opinions about changes in duties, i.e., "duties are relatively static" and "changes can be explained," and about relating to others, i.e., "relating to a few . . . others" and relating "on a superficial basis."  Doc. 15-1, p. 17.

As non-examining reviewing psychologists, Drs. Bergsten and Castro did not have an ongoing treatment relationship with McCoy and therefore their opinions were not entitled to deference or controlling weight under the treating physician rule.  *See Kornecky v. Comm'r of Soc. Sec*, 167 Fed. Appx. 496, 508 (6th Cir. 2006)*; Daniels v. Comm'r of Soc. Sec.,* 152 Fed. Appx. 485, 490 (6th Cir. 2005).   It is the ALJ's responsibility to evaluate the opinion evidence using the factors set forth in 20 C.F.R. § 404.1527.  *See* 20 C.F.R. § 404.1527(c).  Those factors

include (1) the length of the treatment relationship and the frequency of the examination, (2) the

nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the

consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6)

any other factors that tend to support or contradict the opinion.  *Id.*  However, even when the

opinion at issue was rendered by a treating physician, which is not the situation in this case, the

ALJ is not obliged to include in her decision an exhaustive factor-by-factor analysis of the

factors.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

> Drs. Bergsten opined as follows regarding McCoy's abilities:

> [McCoy] retains the ability to perform simple, repetitive tasks in situations where
> duties are relatively static and changes can be explained.  She is also capable of
> relating to a few familiar others on a superficial basis.

Tr. 600.  Dr. Castro affirmed Dr. Bergsten's assessment.  Tr. 601.

> Although Drs. Bergsten and Castro were not treating psychologists, the ALJ considered

their opinions consistent with the Regulations and explained the weight assigned to them, stating:

> The State agency psychological consultants' mental assessments are given overall
> great weight as they support the determination that the claimant can perform work
> with a SVP of one to two as this constitutes work that can be learned within 30
> days and consists of simple, routine tasks and the claimant has been restricted to
> work without high production requirements (Exhibits 6F, 7F, 8F, VE testimony).
> However, the overall evidence shows that the claimant can interact with others
> successfully and that her interaction is being limited in order to prevent her from
> being overwhelmed and to give deference to her mother's averments that she has
> issues with frustration and temper.

Tr. 33.

> The ALJ concluded that the evidence supported an RFC with the following restrictions:

> [W]ork with no more than SVP . . . of one to two which means work that can be
> learned in no more than thirty days and work which does not require any decision-
> making; occasional interaction with coworkers and supervisors; and work with no
> high production quotas.

Tr. 24.

While the ALJ's RFC assessment is not identical to the opinions of Drs. Bergsten and Castro, the Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a); 404.1546(c). It is the responsibility of the ALJ, not a physician, to assess a claimant's RFC. *See* 20 C.F.R. § 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). The ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.* (internal citations omitted); *see also Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC").

Moreover, even where an ALJ provides "great weight" to an opinion, an ALJ is not required to adopt wholesale limitations contained therein. *Moore v. Comm'r of Soc. Sec.*, 2013 WL 6283681, * 7-8 (N.D. Ohio Dec. 4, 2013) (M.J. White) (even though the ALJ did not incorporate into the RFC all limitations from a consultative examiner's opinion that the ALJ assigned great weight to, the ALJ's decision was not procedurally inadequate nor unsupported by substantial evidence); *see also Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133, * 11 (N.D. Ohio Mar. 19, 2013) *affirmed*, 6th Cir. 13-3578 (Jan. 30, 2014) (ALJ not obligated to explain each and every limitation or restriction adopted or not adopted from a non-examining physician's opinion).

While the ALJ did not adopt each and every limitation from the opinions of Drs. Bergsten and Castro, the ALJ did not ignore their opinions nor did the ALJ fail to explain the weight provided to their opinions. Furthermore, the ALJ accounted for limitations in both

concentration, persistence and pace as well as social interaction and, as discussed above, although the ALJ provided "overall great weight" to the opinions of Drs. Bergsten and Castro, the ALJ was not obligated to adopt the opinions verbatim.  Moreover, the ALJ's RFC is supported by substantial evidence.  For example, the ALJ relied upon the consultative examiners' opinions to support the social limitations in the RFC and to support her conclusion that McCoy was capable of performing simple, routine and repetitive tasks.  Tr. 23, 27, 28-29, 580, 755.  More particularly, Dr. Morse opined that "there was no evidence to suggest that [McCoy] is unable to respond appropriately to changes in the work setting . . ." Tr. 29, 756.  This provides support for the ALJ's RFC (Tr. 24) which did not include the limitations from Dr. Bergsten and Castro's opinions of "situations where duties are relatively static and changes can be explained." (Tr. 600).

Based on the foregoing, McCoy has failed to demonstrate reversible error with respect to the ALJ's weighing of the state agency reviewing psychologists' medical opinions.

**B.      Remand and reversal is not warranted for further consideration of GAF scores**

McCoy takes issue with the ALJ's consideration of and weighing of various GAF scores assigned to McCoy.  Doc. 15-1, pp. 20-22; Doc. 21, pp. 4-5.   McCoy contends that, in light of the fact that GAF scoring has been discontinued by the latest edition of the DSM-V[13] and the agency's clarification in SSA, Administrative Memorandum 13066 (July 22, 2013), regarding how to use GAF scores, the ALJ relied too heavily on certain GAF scores and failed to clearly explain the weight assigned to the various GAF scores.  Doc. 15-1, pp. 20-22; Doc. 21, pp. 4-5.  Additionally, McCoy asserts that the ALJ improperly used GAF scores to prove McCoy's level of functioning and to support a particular set of RFC restrictions.  Doc. 15-1, p. 22.

---

[13] *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

As recently summarized by another court in this District, the Sixth Circuit has taken a case-by-case approach regarding the value of GAF scores and held that a "GAF score is not essential to the RFC's accuracy . . . a GAF score may be of considerable help to the ALJ in formulating the RFC." *See Walsh v. Colvin*, 2016 WL 1752854, * 15-16 (N.D. Ohio May 3, 2016) (internal citations and quotations omitted). Nevertheless, an ALJ is "not . . . required to place any particular amount of weight on a GAF score . . . [and] the failure to reference a GAF score is not, standing along, sufficient ground to reverse a disability determination." *Id.* at * 16 (internal citations and quotations omitted). In *Walsh*, the claimant relied upon the same administrative guidance relied upon by McCoy in this case to argue that the ALJ did not properly weigh the GAF scores. *Id.* at * 16. The court in *Walsh* noted that the "SSA's directives in AM-13066 and AM-13066 REV[14] that ALJs must provide 'good reasons' for the weight assigned to a GAF score from treating source, appear to potentially conflict with Sixth Circuit case law that ALJs are not required to consider GAF scores, and the 'failure to reference a GAF score is not standing alone, sufficient ground to reverse a disability determination.'" *Id.* at * 17 (internal citations omitted). However, as noted by the court *Walsh* and as is the case here, neither party has addressed the apparent conflict and/or provided the court with case law regarding what weight a district court is to provide to SSA administrative messages in federal court proceedings. *Id.*

In this case, the ALJ did acknowledge the various GAF scores and provided reasoned explanations for the weight assigned to the GAF scores. Tr. 32-33. Moreover, the ALJ did not solely rely upon the GAF scores to formulate the RFC assessment and, even if the ALJ's

---

[14] As noted by the court in *Walsh*, the SSA issued a revised version of AM-13066 ("AM-13066 REV."). *Walsh, 2016 WL 1752854*, * 16. McCoy refers to the administrative guidance as SSA, Administrative Memorandum. Doc. 15-1, p. 21. In *Walsh*, the same administrative guidance was referred to as an SSA administrative message. *Walsh, 2016 WL 1752854*, * 16.

discussion and weighing of the GAF scores was imperfect,[15] McCoy has not shown that the

ALJ's decision is unsupported by substantial evidence.  The ALJ considered other evidence,

including medical opinion evidence, McCoy's treatment history, McCoy's daily activities,

McCoy's own subjective statements regarding her symptoms and her mother's lay witness

statements.  Tr. 23, 24-33.

Based on the foregoing, remand and reversal is not warranted for further consideration of

the various GAF scores.

**C.      Reversal and remand is warranted for further consideration and/or explanation of
the production quota restriction contained in the RFC and the VE testimony
regarding that restriction**

McCoy argues that the Step Five determination is not supported by substantial evidence

and remand is necessary because the ALJ's RFC and decision and the VE testimony are

inconsistent with respect to pace limitations.  Doc. 15-1, pp. 23-24; Doc. 21, pp. 5-6.

"In order for a vocational expert's testimony in response to a hypothetical question to

serve as substantial evidence . . . the question must accurately portray a claimant's physical and

mental impairments.  The hypothetical questions, however, need only incorporate those

limitations which the ALJ has accepted as credible."  *Parks v. Social Sec. Admin.*, 413 Fed.

Appx. 856, 865 (6th Cir. 2011) (citing *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir.

2010) and *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)).

Also, substantial evidence does not support an ALJ's decision to deny disability benefits where

the VE's testimony is unclear.  *Barker v. Astrue*, 2010 WL 2710520, * 6 (N.D. Ohio July 7,

---

[15] McCoy takes issue with the ALJ's inconsistency in assigning weight to a GAF score of 63, noting that the ALJ
first assigned great weight to the GAF score of 63 from 2005 and then subsequently assigned no weight to the score
because it did not relate to the time period in question.  Tr.  33. However, McCoy has not shown that a remand for
the purpose of clarifying whether the ALJ intended to provide great or no weight to the 2005 GAF score of 63 would
serve to bolster her claim that the ALJ's decision is not supported by substantial evidence or how the inconsistency
amounts to more than harmless error. *See e.g., Rabbers v. Comm'r of Soc. Sec. Adm.*, 582 F.3d 647, 654 (6th Cir.
2009) ("courts are not required to 'convert judicial review of agency action into a ping-pong game' where 'remand
would be an idle and useless formality'") (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766, n. 6 (1969)).

2010) (remanding case due to lack of substantial evidence where VE's testimony was unclear); *see also D'Angelo v. Comm'r of Soc. Sec.*, 475 F. Supp. 2d 716, 724 (W.D. Mich. 2007) (recommending remand, in part, because VE's testimony was unclear); *Welch v. Astrue*, 2011 WL 4632922, * 3 (N.D. Ohio Sept. 30, 2011) (court unable to find Step Four determination supported by substantial evidence where VE testimony was not clear).

Here, the ALJ's RFC included a limitation of "work with no high production quotas" (Tr. 24) and the VE hypothetical question that the ALJ posed to the VE included a limitation of "no high production quotas on the job." (Tr. 77). The VE indicated that there would be jobs available that the described individual could perform, including packager, dishwasher, and cleaner. Tr. 77. The ALJ then sought clarification from the VE that the jobs identified, with specific reference to packager, would not require high production quotas on an assembly line. Tr. 77-78. The VE clarified that the packager job identified was a hand packager position that would require an expectation of production throughout the day that would not be determined by an external source. Tr. 78. In response to further questioning by McCoy's counsel, the VE indicated that he understood the limitation of "no high production quotas" to mean that "pace is not dictated by an external source." Tr. 80. Further, the VE agreed that certain employers for at least one of the identified jobs, i.e., dishwasher, could require a high level of productivity even when expectations regarding production are not be controlled by an external source. Tr. 80-81. This testimony by the VE makes it unclear whether the VE was providing testimony in response to the hypothetical question which contained a limitation of "work with no <u>high</u> production quotas" or whether the VE was responding to an alternate or modified hypothetical that only restricted the individual to work not including production quotas controlled by an external source.

The ALJ acknowledged the VE's testimony that there would be expectations for any job position; i.e., that a dishwasher would be expected to have dishes washed by the end of the day but without an expectation that the dishes be washed immediately.  Tr. 34.  The ALJ also acknowledged that different employers would have different expectations.  Tr. 34.  However, the ALJ's acknowledgements of the VE's further explanation of production expectations does not serve to clarify the VE testimony or make clear that the Step Five determination is supported by substantial evidence.  This is particularly so because the ALJ concluded that "[t]he cognizant fact is that the representative positions identified by the vocational expert do not have any production quotas mandated by an external source and permit an individual to have some work variance . . ."  Tr. 35.  This statement does not make clear that the VE identified jobs involving work with no <u>high</u> production quotas.  Further, while the ALJ's statement might suggest that the ALJ intended an RFC limitation of no production quotas mandated by an external source, the RFC limitation is without regard to whether production quotas are controlled by an external source.  The RFC limitation with respect to pace is "work with no <u>high</u> production quotas."  Tr. 24 (emphasis supplied).

Based on the unclear VE testimony and uncertainty as to whether the VE identified jobs in response to a VE hypothetical that accurately reflected the RFC limitations or whether the VE was responding to a modified or alternate hypothetical, the Court cannot determine whether the ALJ's Step Five determination is supported by substantial evidence.  Accordingly, remand is necessary for clarification as to the RFC limitation regarding production quotas and/or for additional VE testimony responsive to a VE hypothetical that clearly and accurately portrays the limitations as contained in the RFC.

### VII. Conclusion

For the reasons set forth herein, the Court **REVERSES and REMANDS** the Commissioner's decision.[16]

Dated: November 4, 2016

Kathleen B. Burke
United States Magistrate Judge

---

[16] This opinion should not be construed as requiring a determination on remand that McCoy is disabled.